**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

**UNITED STATES OF AMERICA**,

                Plaintiff,

    v.                                  No. 17-03142-01-CR-S-RK

**DONALD ANDREW JONES**,

                Defendant.

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties described below have entered into the following plea agreement:

1.      **The Parties.**  The parties to this agreement are the United States Attorney's Office for the Western District of Missouri (otherwise referred to as "the Government" or "the United States"), represented by Thomas M. Larson, Acting United States Attorney, and Steven M. Mohlhenrich, Assistant United States Attorney, and the defendant, Donald Andrew Jones ("the defendant"), represented by Alan J. Tauber, Esq.

The defendant understands and agrees that this plea agreement is only between him and the United States Attorney for the Western District of Missouri, and that it does not bind any other federal, state or local prosecution authority or any other government agency, unless otherwise specified in this agreement.

2.      **Defendant's Guilty Plea**.  The defendant agrees to and hereby does plead guilty to **Count 1** of the information, charging him with a violation of **18 U.S.C. § 371**, that is, Conspiracy. The defendant also agrees to forfeit to the United States the property described in the Forfeiture Allegation of the Information.  By entering into this plea agreement, the defendant admits that he knowingly committed these offenses, and is, in fact, guilty of these offenses.

3.     **Factual Basis for Guilty Plea.**  The parties agree that the facts constituting the offenses to which the defendant is pleading guilty are as follows:

A.     **Defendant's Plea to Count 1 of the Information**

1)     The defendant, Donald Andrew Jones, also known as "D.A." Jones ("Jones"), a resident of Willingboro, New Jersey, was a Philadelphia, Pennsylvania-based political operative.

2)     Jones owned and operated the firm, D.A. Jones & Associates, which purported to provide political and advocacy services, including consulting, analysis, and public relations.

*Alternative Opportunities, Inc. and Preferred Family Healthcare, Inc.*

3)     Preferred Family Healthcare, Inc. ("PFH"), formerly known as Alternative Opportunities, Inc. ("AO"), was a Missouri corporation headquartered at 1111 South Glenstone Avenue, in Springfield, Greene County, Missouri, within the Western District of Missouri.  Both AO and PFH were recognized by the Internal Revenue Service (IRS) as non-profit public charities under Section 501(c)(3) of the Internal Revenue Code (United States Code, Title 26).  PFH resulted from the May 1, 2015, merger between Alternative Opportunities, Inc. ("AO"), of Springfield, Missouri (Missouri corporate charter no. N00045067), and Preferred Family Healthcare, Inc., of Kirksville, Missouri (Missouri corporate charter no. N00024607).  AO was the acquiring entity, but the post-merger entity retained the PFH name and corporate registration with the Missouri Secretary of State. (Hereinafter, "the Charity" shall refer to the entity over all times material to this Information, disregarding the Kirksville, Missouri-based Preferred Family Healthcare, Inc., that existed prior to May 2015, and is not relevant to this Information.)

4)     The Charity and its subsidiaries provided a variety of services to individuals, including the following:   mental and behavioral health treatment and counseling, substance abuse treatment and counseling, employment assistance, aid to individuals with developmental disabilities, and medical services.

5)     For the fiscal years 2010 through 2016, each fiscal year beginning July 1 of the indicated year, and ending on June 30 of the following year, the Charity had total revenue in the amounts indicated below:

| Fiscal Year | Entity | Total Revenue |
|-------------|--------|---------------|
| FY2010 | AO | $    64,779,466 |
| FY2011 | AO | $    77,271,030 |
| FY2012 | AO | $    77,112,631 |
| FY2013 | AO | $    90,033,026 |

| Fiscal Year | Entity | Total Revenue |
|---|---|---|
| FY2014* | AO | $ 89,844,968 |
| FY2014 | PFH | $ 66,264,806 |
| FY2015 | PFH | $ 127,276,627 |
| FY2016 | PFH | $ 180,737,583 |
| **Total:** | | **$ 837,167,436** |

\* For AO, FY2014 ended 04/30/2015 because AO merged with the Kirksville, Missouri based Preferred Family Healthcare, Inc.

6) For the calendar years 2011 through 2016, the Charity received Medicaid reimbursements from the states of Arkansas, Kansas, Missouri, and Oklahoma, in the amounts indicated below:

| | Arkansas | Kansas | Missouri | Oklahoma | Total |
|---|---|---|---|---|---|
| | | Medicaid Reimbursement by State (Total Reimbursements) | | | |
| 2011 | $ 22,917,095 | $ 114,653 | $ 12,051,231 | $ 5,984,647 | $ 35,082,979 |
| 2012 | $ 26,275,165 | $ 102,540 | $ 13,679,546 | $ 7,323,957 | $ 40,057,252 |
| 2013 | $ 28,843,342 | $ 1,012,503 | $ 14,411,117 | $ 8,977,498 | $ 44,266,962 |
| 2014 | $ 32,017,605 | $ 966,043 | $ 18,540,234 | $ 10,040,355 | $ 51,523,882 |
| 2015 | $ 35,521,005 | $ 918,288 | $ 32,424,388 | $ 10,000,473 | $ 68,863,682 |
| 2016 | $ 33,403,414 | $ 934,368 | $ 58,494,910 | $ 9,857,786 | $ 92,832,692 |
| Total | $ 178,977,627 | $ 4,048,395 | $149,601,427 | $ 52,184,716 | $384,812,165 |

| | Arkansas | Kansas | Missouri | Oklahoma | Total |
|---|---|---|---|---|---|
| | | Medicaid Reimbursement by State (Federal Portion) | | | |
| 2011 | $ 16,355,931 | $ 67,703 | $ 7,627,224 | $ 3,886,430 | $ 24,050,858 |
| 2012 | $ 18,579,169 | $ 58,356 | $ 8,679,672 | $ 4,678,544 | $ 27,317,197 |
| 2013 | $ 20,227,835 | $ 572,166 | $ 8,844,102 | $ 5,745,599 | $ 29,644,103 |
| 2014 | $ 22,444,341 | $ 549,775 | $ 11,500,507 | $ 6,427,835 | $ 34,494,624 |
| 2015 | $ 25,177,289 | $ 520,026 | $ 20,573,248 | $ 6,230,295 | $ 46,270,563 |
| 2016 | $ 23,382,390 | $ 522,872 | $ 37,015,579 | $ 6,012,264 | $ 60,920,841 |
| Total | $ 126,166,955 | $ 2,290,898 | $ 94,240,332 | $ 32,980,967 | $255,679,153 |

7) For the fiscal years 2010 through 2015, each fiscal year beginning July 1 of the indicated year, and ending on June 30 of the following year, the Charity received at least $53,411,253 in funds from the Federal government (more particularly, the Departments of Health and Human Services, Labor, Agriculture, Housing and Urban Development, Veterans Affairs, and Justice), under programs involving grants, contracts, loans, guarantees, insurance, and other forms of Federal assistance, broken down by fiscal year (ending June 30), in the following amounts:

|          | USDA       | HHS*          | HUD        | DOJ       | DOL           | VA           |
|----------|-----------|---------------|-----------|-----------|---------------|--------------|
| FY2010   | $ 9,295   | $ 848,054     | $ -       | $ -       | $ 3,122,098   | $ -          |
| FY2011   | $ 9,330   | $ 1,368,239   | $ 33,403  | $ -       | $ 3,488,094   | $ 381,266    |
| FY2012   | $ 9,213   | $ 1,731,955   | $ 116,906 | $ -       | $ 3,145,749   | $ 352,841    |
| FY2013   | $ -       | $ 2,500,587   | $ 89,455  | $ -       | $ 3,324,939   | $ 377,969    |
| FY2014 (AO)** | $ -  | $ 4,340,302   | $ -       | $ 304,672 | $ 2,638,085   | $ -          |
| FY2014 (PFH)  | $ 80,348 | $ 6,888,549 | $ 99,248 | $ -      | $ 780,862     | $ 62,328     |
| FY2015   | $ 142,059 | $ 12,312,338 | $ 102,273 | $ 39,868 | $ 4,637,628   | $ 73,300     |
| Total    | $ 250,245 | $ 29,990,024 | $ 441,285 | $ 344,540 | $ 21,137,455  | $ 1,247,704  |

\* Not including Medicaid reimbursement.

\*\* For AO, FY2014 ended 04/30/2015 because AO merged with the Kirksville, Missouri based Preferred Family Healthcare, Inc.

*Persons*

8)      "Person #1," a resident of Springfield, Missouri, was an executive at the Charity, with authority to approve and direct payments of funds and enter into agreements on behalf of the company.

9)      "Person #2," a resident of Springfield, Missouri, was an executive at the Charity, with authority to approve and direct payments of funds and enter into agreements on behalf of the company.

10)     "Person #3," a resident of Springfield, Missouri, was an executive at the Charity, with authority to approve and direct payments of funds and enter into agreements on behalf of the company.

11)     "Person #4," a resident of Rogers, Arkansas, was a lobbyist registered with the Arkansas Secretary of State.  Person #4 also was an employee of the Charity, serving as an executive for company operations in the state of Arkansas.  Person #4 also operated the entities identified below as Lobbying Firm A and Lobbying Firm B.

12)     "Person #7," a resident of Melbourne, Arkansas, was an Arkansas legislator from 2006 through 2011, and a lobbyist registered with the Arkansas Secretary of State from January 20, 2011 onward.  Person #7 also was a member of the AO Board of Directors from October 2009 through May 2015.  Person #7 also was employed by the Charity, from February 2010 until February 2017.

13)    Dayspring Behavioral Health Services ("Dayspring") was one of the business aliases that AO used to conduct business.  Doing business as Dayspring, AO operated dozens of clinics throughout the state of Arkansas, offering a variety of behavioral health services to individuals, families, and groups.

14)    "Entity A" was a Missouri limited liability company that was used as the management company for AO.  Entity A was formed in 1995 by Person #1, Person #2, Person #3, and four of their associates.  In 2006, Entity A was sold to a publicly-traded corporation by its five remaining owners, including Person #1, Person #2 and Person #3; however, Person #1 continued to exercise actual control over the bank accounts and activities of Entity A.

15)    "Entity E" was a Missouri S-corporation that was in the business of re-packaging and selling indoor thermostats imported from China.  Entity E was formed in 2006, using funds Person #1 and Person #2 received from the sale of Entity A to a publicly traded corporation.  Person #1 and Person #2 owned a combined 45.1086 percent share of Entity E, and a relative of Person #2 owned another 45.1086 percent.

16)    "Lobbying Firm A" was an Arkansas C-corporation and lobbying organization registered with the Arkansas Secretary of State.  Lobbying Firm A was solely owned and operated by Person #4, and purported to provide political services, including lobbying, consulting, and advocacy.

17)    "Lobbying Firm B" was a lobbying organization registered with the Arkansas Secretary of State, which listed a family member of Person #4 as its authorized representative.  On February 5, 2013, Person #4 opened a bank account at Bancorp South in the name of Person #4 doing business as Lobbying Firm B.

*Laws and Regulations Pertaining to Section 501(c)(3) Organizations*

18)    The Internal Revenue Service ("IRS") was an agency of the United States Department of Treasury, responsible for the ascertainment, computation, assessment, and collection of taxes owed to the United States Treasury by individuals, corporations and other entities.  One of the IRS's missions was to oversee the operation of organizations exempt from income tax under Section 501(c)(3) of the Internal Revenue Code (Title 26 of the United States Code).

19)    Section 501(c)(3) of the Internal Revenue Code granted authorized charitable organizations tax-exempt status, which exempted them from having to pay any income tax on the donations they received.  To qualify for exemption under that section, an organization was required to file an IRS Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code.  In this application,

signed under penalties of perjury, the organization was required to demonstrate that it was organized and operated exclusively for charitable exempt purposes, and any non-exempt purpose was be incidental and not substantial to its operation. Upon approval, the IRS would issue a determination letter that provided written assurance of the organization's tax-exempt status, and its qualification to receive tax-deductible charitable contributions. Every organization qualifying for exemption under section 501(c)(3) would also be classified as either a "public charity" or a "private foundation."

20)     In accomplishing its oversight mission, the IRS primarily relied upon information reported annually by each tax-exempt organization. Additionally, in determining an organization's entitlement to tax-exempt status, the IRS utilized information provided by tax exempt organizations in response to specific IRS inquiries, information provided by other federal and state agencies, and members of the public.

21)     After the IRS granted an organization tax-exempt status, the organization was required to file an informational return, Form 990, "Return of Organization Exempt from Income Tax" each year in which an organization had gross receipts greater than or equal to $200,000 or total assets greater than or equal to $500,000. The return was signed under penalties of perjury. Form 990 was an annual information return required to be filed with the IRS by most organizations exempt from income tax under section 501(a), and certain political organizations and nonexempt charitable trusts. Parts I through XII of the form were required to be completed by all filing organizations, and required reporting of the organization's exempt and other activities, finances, governance, compliance with certain federal tax filings and requirements, and compensation paid to certain persons. Additional schedules were required to be completed depending upon the activities and type of the organization. By completing Part IV, the organization determined which schedules were required. The entire completed Form 990 was filed with the IRS, except for certain contributor information on Schedule B (Form 990, 990-EZ, or 990-PF), which was required to be made available to the public by the IRS and the filing organization, and also could be required to be filed with state governments to satisfy state reporting requirements.

22)     Section 501(c)(3) organizations were required to report excess benefit transactions on Forms 990. The term "excess benefit transaction" meant any transaction in which an economic benefit was provided by an applicable tax-exempt organization directly or indirectly to or for the use of any disqualified person if the value of the economic benefit provided exceeded the value of the consideration (including the performance of services) received for providing such benefit. (For purposes of the preceding sentence, an economic benefit was not to be treated as consideration for the performance of services unless such organization clearly indicated its intent to so treat such benefit.) The term "disqualified person" meant any person who was in a position to exercise substantial influence over the affairs of the applicable tax-exempt organization at any time during the five-year period ("lookback period") prior to the date of such transaction.

23) Section 501(c)(3) organizations were required to disclose the existence of excess benefit transactions on page four (4) of IRS Form 990, by responding "yes" or "no" to questions 25(a) and 25(b) – disclosing whether they had such transactions in the current period, or had discovered past such transactions). If the organization answered either question in the affirmative, it was required to describe the excess benefit transaction in Schedule L Part I of the Form 990.

24) Section 501(c)(3) organizations were absolutely prohibited from directly or indirectly participating in, or intervening in, any political campaign on behalf of, or in opposition to, any candidate for elective public office. Contributions to political campaign funds violated this prohibition, and could have resulted in denial or revocation of tax-exempt status and the imposition of certain excise taxes.

25) Further, organizations not considered "electing organizations" (those making an election under Section 501(h), which election the Charity did not make) were subject to the "No Substantial Part" rule, which provided that no substantial part of the organization's activities could constitute carrying on propaganda, or otherwise attempting to influence legislation. So the IRS and the public could monitor tax-exempt organizations' compliance with the "No Substantial Part" Rule, Section 501(c)(3) organizations not making an election under Section 501(h), including the Charity, were required to disclose any and all lobbying activity in Part IX (Statement of Functional Expenses) of their annually-filed IRS Forms 990.

26) Finally, all organizations seeking exemption under Section 501(c)(3) were required to conform to certain fundamental legal principles applicable to all charitable organizations. One such principle was that charitable organizations could not engage in behavior that was illegal or violated public policy. The "illegality doctrine" derived from English charitable trust law, the legal foundation on which Section 501(c)(3) was established. Under charitable trust law, trusts violating law or public policy could not qualify for charitable status.

*Object of the Conspiracy*

27) From in or about April 2011, until in or about January 2017, in Greene County, Missouri, in the Western District of Missouri, and elsewhere, the defendant, Donald Andrew Jones, conspired and agreed with Person #1, Person #2, Person #3, and Person #4, and with others known and unknown to the United States Attorney, to execute a scheme whereby Person #1, Person #2, Person #3, and Person #4, being agents of Alternative Opportunities, Inc., and Preferred Family Healthcare, Inc., organizations receiving in each one-year period from July 1, 2010, through June 30, 2017, benefits in excess of $10,000 under the Federal programs set forth above, embezzled, stole, obtained by fraud, and without authority knowingly converted to their use, property worth at least $5,000 and under the care, custody, and control of such organization, that is funds totaling

approximately $973,807.28; in violation of Title 18, United States Code, Section 666(a)(1)(A) and (a)(2).

*Manner and Means*

28)     The manner and means by which Person #1, Person #2, Person #3, Person #4, Person #7, Jones, and others, carried out the scheme included but were not limited to the following:

29)     Person #1, Person #2, Person #3, and Person #4 and others known and unknown to the United States Attorney, devised and executed multiple schemes to embezzle, steal, and unjustly enrich themselves to the detriment of the Charity's mission, and to unlawfully use the Charity's funds for political contributions and excessive and unreported lobbying and political advocacy.

30)     As an integral and necessary part of their schemes to defraud, Person #1, Person #2, Person #3, Person #4, and others known and unknown to the United States Attorney, utilized the Charity's tax-exempt status to facilitate their embezzlement, theft, and unjust enrichment of themselves, and in order to maintain said tax-exempt status they concealed, covered up, and falsified evidence of their embezzlement, unjust enrichment, and excess benefit transactions to themselves and others, and of their unlawful use of the Charity's funds for political contributions and excessive and undisclosed lobbying and political advocacy, and failed to disclose the same to the IRS on the Charity's Forms 990 as required by law.

31)     It was a part of the scheme that in order to provide a veneer of legitimacy for the kickbacks paid to themselves and others, and to disguise the nature and source of the payments, Person #1, Person #2, Person #3, and Person #4 would and did cause the payments to be described in the books and records of the relevant entities as payments for business expenses, such as "consulting" and "training" services, and to that end they would and did cause the relevant entities to execute sham "consulting agreements."

32)     It was further a part of the scheme that in order to increase the supply of funds from which they could embezzle and steal, Person #1, Person #2, Person #3, and Person #4 would and did cause the Charity to seek out and obtain additional sources of revenue, including grants and other program funds from the Federal government and from state governments and quasi-governmental entities.  To accomplish this objective, Person #1, Person #2, Person #3, and Person #4 would and did cause the Charity to engage in "political outreach" that violated both law and public policy, including the following:

> a.  Person #1, Person #2, and Person #3, would and did employ lobbyists and advocates, including Person #4, to influence elected and appointed public officials to the financial benefit of the Charity, and themselves, while concealing and covering up

the nature of the services the lobbyists and advocates provided to the Charity.

b. Person #1, Person #2, and Person #3, through its lobbyists and advocates, including Person #4, would and did cause the Charity to contribute financially to elected officials and their political campaigns, which indirect contributions were prohibited by law just as if the payments had been made by the Charity directly.

c. At the suggestion of lobbyists and advocates working for the Charity, Person #1, Person #2, and Person #3, would and did contribute and cause others to contribute financially, in their personal capacities, to elected officials and their political campaigns, and further would and did cause the Charity to reimburse the individuals making the contributions, which indirect contributions were prohibited by law just as if the payments had been made by the Charity directly.

33)     It was further a part of the scheme that Person #1, Person #2, Person #3, and Person #4 would and did cause the books, records, and public disclosures of the Charity to misrepresent, conceal, and cover up the nature of the services provided by the lobbyists and advocates, and financial contributions to elected officials and their political campaigns, by falsely describing such payments being for "training" and "consulting," and by causing the Charity to execute sham "consulting agreements," with lobbyists and advocates.

34)     It was further a part of the scheme that Person #1, Person #2, Person #3, and Person #4 would and did instruct the persons providing the advocacy services to submit – and for persons employed by the Charity to create internally – invoices seeking payment from the Charity for services falsely described as "training" and "consulting," that were in truth and in fact lobbying, advocacy work, and kickbacks.

35)     It was further a part of the scheme that Person #1, Person #2, and Person #3 would and did cause the Charity to disburse funds to Lobbying Firm A and Lobbying Firm B for lobbying and advocacy services, and to disburse funds directly to persons providing lobbying and advocacy services.

36)     It was further a part of the scheme that Person #4, in addition to personally performing lobbying and advocacy services on behalf of the Charity, would and did use funds disbursed by the Charity to Lobbying Firm A and Lobbying Firm B to pay for lobbying and advocacy services performed by others, including Jones.

37)     It was further a part of the scheme that in or about 2011, Jones entered into an agreement with Person #1, Person #2, Person #3, and Person #4 that he would provide advocacy services for AO, including direct contact with legislators, legislators' offices, and

government officials, in order to influence elected and appointed public officials to the financial benefit of AO.

38)     It was further a part of the scheme that from 2011 through January 2017, Jones would and did solicit the assistance of elected and appointed officials regarding legislative issues that impacted the Charity.

39)     It was further a part of the scheme that from 2011 through January 2017, Jones would and did solicit the assistance of elected and appointed officials in particular matters involving the Charity.

40)     It was further a part of the scheme that from 2011 through January 2017, Jones would and did solicit the assistance of elected and appointed officials in steering grants and other sources of funding to the Charity.

41)     It was further a part of the scheme that in exchange for Jones's services, the Charity would and did make payments to D.A. Jones & Associates, both directly and through other entities.

42)     It was further a part of the scheme that in order to conceal the nature of the services for which they caused the Charity to contract, Person #1, Person #2, Person #3, and Person #4 would and did describe the services provided by Jones as "consulting" services, and the payments made to Jones as payments pursuant to a "consulting agreement."

43)     It was further a part of the scheme that initially, and for more than four years, the conspirators did not put their agreement in writing.

44)     It was further a part of the scheme that on or about January 1, 2016, Person #3, on behalf of PFH, and Jones executed a sham "consulting agreement."

45)     It was further a part of the scheme that Jones agreed to pay ("kick back") a part of the funds Jones received from the Charity and the related entities to Person #4.

46)     It was further a part of the scheme that in order to conceal the nature and source of some of the funds the Charity paid to Jones, Person #1, Person #2 and Person #3 would and did cause some of those payments to be routed through Entity A, Lobbying Firm A, and Lobbying Firm B.

47)     It was further a part of the scheme that Jones would and did pay kickbacks to Person #4, primarily by checks made payable to Person #4 or to Lobbying Firm A or Lobbying Firm B.  Also, at the request of Person #4, Jones would and did make two payments to Person #7.

48)     It was further a part of the scheme that Person #1 and Person #2 would and did direct Jones to perform advocacy services on behalf of their for-profit corporation, Entity E, for which Entity E did not compensate Jones.

49)     It was further a part of the scheme that Person #1 and Person #2 would and did cause the Charity to compensate Jones for his work performed on behalf of Entity E.

*Overt Acts*

50)     In furtherance of the conspiracy, and to accomplish its objects, the defendant Donald Andrew Jones, and Person #1, Person #2, Person #3, and Person #4, and others known and unknown to the United States Attorney, committed the following overt acts, among others, in the Western District of Missouri and elsewhere:

51)     In 2010, Person #4 requested Jones's assistance in responding to a U.S. Department of Labor audit of AO regarding overtime pay.

52)     On October 26, 2010, Jones provided a document entitled, "Plan of Action" to AO. This document stated, "[t]he goal of this Plan of Action is to sway the Senate and House Committees to stand by the decisions made by the Department of Labor in their 1995 and 2006 letter and opinion documents concerning the Fair Labor Standards Act."

53)     On February 22, 2011, Person #3 e-mailed Jones, informing him that four members of the U.S. Senate, identified by name, and several members of the U.S. House of Representatives, also identified by name, could assist in their effort.

54)     On March 24, 2011, Jones e-mailed Person #4, stating:

> Once again, it is great to hear that the Department of Labor has decided to withdraw its investigation of Alternative Opportunities. This was a big win!
>
> Last week, I was in D.C. and took the time to reach out to ["U.S. Representative #1"], ["U.S. Representative #2"], ["U.S. Representative #3"] and ["U.S. Senator #1"] and thank them for their time and attentiveness to Alternative Opportunities and inform them that the investigation was dropped. They were pleased to hear about the positive turnout.
>
> Not only have we achieved a positive outcome on the investigation, the time and effort also resulted in additional relationships for Alternative Opportunities.

55)     On March 25, 2011, Person #1 e-mailed Person #4, stating: "Let me know when you receive the FedEx so I won't worry about it. Want to make sure you and Mr. Don are taken care of."

56)     On May 4, 2011, Jones e-mailed Person #4, stating:

After much consideration, I strongly suggest that the Alternative Opportunities team make political contributions to the legislators that were key in our recent success.

Of course, since corporate contributions are not acceptable this would require individual contributions to be given. The following legislators were very supportive in our success, [U.S. Senator #1], [U.S. Representative #2], [U.S. Representative #1], and [U.S. Representative #3]. Additionally, I would strongly suggest supporting newly elected (as of January 2011), ["U.S. Senator #2"].

Especially with [U.S. Representative #1] and [U.S. Senator #2], I wouldn't be surprised to find that neither have had an African American contributor. Not only would the company be supporting these legislators politically, but I believe that having these contributions provided through me would be poignant and further allow our contribution to not go unnoticed.

Let me know as I suggest acting sooner than later.

57)     On June 28, 2011, Jones emailed Person # 4, stating:

I have spoken with both ["U.S. Representative #4"] and [U.S. Representative #1] regarding Alternative Opportunities' behavioral health services serving as a lead team for search and recovery efforts during the recent devastation in Joplin, Missouri. The Congressmen were very impressed by the efforts of AO and said that there are federal funds available from FEMA, because FEMA declared it a disaster area, to help recovery some of the costs associated with AO's lead team efforts.

They have requested that I get from AO the FEMA # associated with these efforts and the total costs that were spent in providing search and rescue/recovery efforts in Joplin, MO. Also, any information you have in regards to these efforts please send as well, as this would be greatly appreciated and support the efforts of the Congressmen.

Would you have this information readily available so that I may follow up with them as soon as possible since they have offered to assist?

Additionally, [U.S. Representative #4] will be having a fundraiser in Philadelphia, PA next week and has requested that you join him at the event. Please let me know what your schedule looks like for next week and I will follow up with the details.

58)    On October 13, 2011, Jones emailed Persons #1, #2, #3, #4, and #7, stating:

For the past several months, I have been actively putting forth efforts in Washington to support Alternative Opportunities attempt to collect federal funds to alleviate costs that were a result of the efforts put forth in Joplin, Missouri.

We have made great strides and have received positive feedback and support from both [U.S. Representative #4] and [U.S. Representative #1]. These efforts continue, and I am anticipating a positive outcome in the near future as I remain active in my outreach with the members of Congress, ensuring that this Alternative Opportunities request remains a top priority for all of your endeavors.

Recently, you requested that I send an invoice to account for my continued services in Washington on behalf of Alternative Opportunities. I wanted to follow up with you and make clear that this invoice accounts for the time and dedication that has been spent towards a positive outcome of your clients and building a stronger relationship for Alternative Opportunities with the Congressional Delegates in Washington and the state's you serve. However, my focus remains on our developed business relationship to tentatively begin January 1st, 2012.

With that understanding, I wanted to note that my current efforts have been and will remain focused on identifying myself as a point Person for Alternative Opportunities, especially as we look forward to the beginning of a long standing contract together. Therefore, I ask that this invoice be viewed as an investment into our business relationship and not an expectation for payment. If you strongly feel you would like to compensate me for services at a rate you feel appropriate, it would be greatly appreciate but by no means required.

Once again, I look forward to our continued work together and strengthening support in Washington. I appreciate your time and please let me know if you have any questions.

59)     On January 7, 2012, Jones prepared a memorandum for Persons #2, #3, #4, and one other Person, with the subject line, "Recovery Schools," which included the following statements:

   a.  We agree that having a collaboration of politicians that are tied to this issue would be key in building momentum and with that we strongly believe that [U.S. Representative #4] would be a key player.

   b.  Additionally, there is The Greater Philadelphia Association for Recovery Education based in Swarthmore, PA. With this information, I am reaching out to [U.S. Representative #4] who currently serves on the Congressional Mental Health Caucus to get an indication of his affiliation and/or support of this school with the anticipation that we can engage him for support of AO's recovery schools agenda.

   c.  Additionally, I am reaching out to ["U.S. Representative #5"]. He seems to be supportive of mental health/substance abuse programs from our research and I am looking to connect with him in D.C. to introduce AO as well as to judge his support for recovery schools within the state.

60)     On July 27, 2012, Person #4 e-mailed Jones and Person #1, stating:

Hey don…[Person #1] and I are each going to send [U.S. Representative #3] a $2,500 donation…where do we send and how do we make out checks?

And what about [U.S. Representative #1]? We are supposed to meet soon with his chief of staff here…he is coming to tour our services…

61)     On July 27, 2012, Jones e-mailed Person #4, stating:

Below are the address and the name of each Congressman's campaign committee.

It is great that [U.S. Representative #1's] COS will be touring the facility. As you know, [U.S. Representative #1] was instrumental in

supporting AO with previous outreach regarding the Deparment of Labor.

A contribution would be great way to show support of his efforts and strengthen AO's relationship.

If you prefer, I can Personally deliver these checks directly to both [U.S. Representative #3] and [U.S. Representative #1] when I am in D.C. This would allow me to ensure that they are received directly by the Congressmen as opposed to be notified by their campaign staff down the road.

62)     On July 31, 2012, Person #4 e-mailed Jones, stating:  "We decided it might have more clout coming from you…should we mail the same amount to u for [U.S. Representative #1]"

63)     On January 27, 2013, Person #4 emailed an AO employee stating, in part:

Can you have someone write a letter to whom it may concern tomorrow for the purpose of getting Don Jones National Public Relations Director for Alternative Opportunities.  We need this on our AO letter head for me to sign, then we need the same letter written on [another Entity's] letterhead for you to sign.  Here is DA info.  We need to get him an Arkansas Picture ID Card.

64)     On April 28, 2013, Person #3 e-mailed Jones, Person #2, and Person #4, stating: "I will be attending an event tues eve for [U.S. Representative #1] and taking checks from [Person #1] and myself --- will give your regards!"

65)     On November 19, 2013, Person #1 e-mailed Jones, regarding Government Bids, stating:  "Thank you very much for helping [Entity E]."

66)     On January 6, 2014, Jones e-mailed Person #1 regarding Entity E's possible relocation to Pennsylvania, stating:

Good Afternoon! Just wanted to confirm with you the January 23rd meeting with [the mayor of a town in Pennsylvania]. The meeting will take place at 10am until approximately 3pm. The meeting will include discussion about the incentives available for relocation to the area as well as a tour of potential sites for the relocation.

67)     On March 5, 2014, Jones emailed Persons #1 and #2 regarding Entity E's eligibility for government grants, stating:

In researching opportunities for [Entity E], I am looking at the opportunities available within weatherization projects. The federal government provides funding to states through the Weatherization Assistance Program. Each state then has its own programs, which it allocates funding to local community action agencies, nonprofits and local governments to provide the actual services generally to low income residents who receive such services for free. A key aspect of weatherization projects is the reduction of energy consumption, which made me think of programmable thermostats.

With the registration that was completed, [Entity E] is registered in SAM (System for Awards Management), which is a federal database for the government to locate vendors. However, we could go after contracts state by state, starting with Louisiana.

Is this something that [Entity E] would like to be involved in if such opportunities to do so are available?

Also, please note, that I continue to work on locating robotics funding for [Entity E].

68) On March 5, 2014, Person #1 replied to Jones stating, "[s]ure we would be interested in LA. Also the robots could go into AO if not [Entity E]."

69) On March 5, 2014, Jones replied to Person #1 stating, "Really?? Non profit might be a lot easier."

70) On March 6, 2014, Person #1 replied to Jones stating, "Yes. We met yesterday doing strategic planning and AO would be willing to do the manufacturing to supplement underfunded programs. Could be huge for them. See what you can find. Thank you for all you do."

71) On February 21, 2015, Jones e-mailed Person #2 and another Person, stating:

It is great to finally see some communication from HUD. Our congressional outreach has been committed to reaching out to HUD until a final approval is reached.

It seems that HUD, as we have assumed, is all over the place and we need to remain active in seeking an answer. However, with our continued outreach I look forward to a positive outcome.

16

Please keep me updated so that I continue to update our congressional support on the status.

72)     On May 27, 2015, Jones e-mailed Person #3 and another Person, stating:

The approach is to go to the overseeing executive level for answers with the support of key legislators in DC not only from Missouri, but also from key legislators across the country that reside on committees that oversee HUD in both the Senate and House.

73)     On June 3, 2015, Jones e-mailed Person #2, stating:

The H.R. 1735 is on its way to the Senate where the Senate has its own version of the bill in S. 1376. Due to the similarities of these bills a congressional conference committee is being organized to reach a compromise on the two bills to assist in its possible passage. I am in the process of reaching out to reach those assigned to this committee and express the stance of AO to have the bill protect the standards of Certified Mental Health Counselors as provided in the Senate version.

74)     On June 16, 2015, Jones e-mailed Person #2, stating "I wanted to give you an update following my meeting with HUD in DC."

75)     On January 21, 2016, Person #3 e-mailed Jones and Person #2 regarding preparing a written contract for Jones's services, stating: "Hey our auditor's told us that we need to have a written contract in place for you---do you have something or want me to draft one? I am glad to…"

76)     On March 16, 2016, Person #3 e-mailed Jones regarding a Department of Labor overtime pay issue that would financially impact AO, stating: "I will forward you a good article that details this situation…would you be able to get with [U.S. Representative #3] about it?"

77)     On June 10, 2016 Jones e-mailed Persons #1 and #2 regarding Entity E, stating:

I am preparing my outreach to potential clients for [Entity E]. Reviewing my materials on [Entity E], I have noticed that they are dated October 2013. Would you have available more recent marketing materials? I want to make sure that I have the most up to date materials to share with potential clients.

78)     In June 2017, Person #1 asked Jones to assist Entity E regarding a shipment of thermostats from China that was being held by U.S. Customs in Kansas City, Missouri.

79)     On or about January 1, 2016, Person #3, on behalf of PFH, and Jones executed a document entitled, "CONSULTING AGREEMENT," the main body of which described Jones's "consulting duties" as follows:

> CONSULTING DUTIES:    Client retains Consultant as an independent contractor to provide to Client the consulting services more particularly described in Appendix A, which is attached and incorporated by reference as a part of the Agreement, and which can generally be described as government and public relations pertinent to the Client's development and delivery of management of treatment, employment, and training services.

While the main body of the "consulting agreement" listed duties generally consistent with those of a professional hired as a consultant, an unsigned Appendix A more particularly described Jones's duties not as consulting services, but as advocacy:

- Meet with elected or appointed officials, employees, departments, divisions, agencies, or boards or commissions of the executive branch of the government that may have an impact on Preferred Family Healthcare, Inc.

- Executive Branch assistance on issues before HUD, Department of Labor, VA, etc.

- Serve as a liaison between Preferred Family Healthcare, Inc. and federal department staff.

- Procurement issues relating Preferred Family Healthcare, Inc. existing contracts and grants.

- Federal Legislative issues including liaison with U.S. Senators and Representatives

80)     On each of the dates set forth below, Persons #1, #2, #3 and #4 caused the Charity to pay to Jones the amounts listed below, from or by way of the source accounts listed below:

|   | Date | Name on Source Account | Account no. (last 4) | Amount |
|---|------|------------------------|----------------------|--------|
| A | 02/28/2011 | Person #4 dba Lobbying Firm B | 5171 | $2,000.00 |
| B | 03/24/2011 | Lobbying Firm A | 2316 | $2,000.00 |

| | Date | Name on Source Account | Account no. (last 4) | Amount |
|---|---|---|---|---|
| C | 04/09/2011 | Person #4 dba Lobbying Firm B | 5171 | $3,000.00 |
| D | 12/15/2011 | Lobbying Firm A | 2316 | $4,000.00 |
| E | 01/02/2012 | Entity A | 3101 | $72,000.00 |
| F | 10/08/2012 | Dayspring | 8747 | $2,813.38 |
| G | 01/01/2013 | Entity A | 3101 | $72,000.00 |
| H | 01/01/2013 | Entity A | 3101 | $48,000.00 |
| I | 01/18/2013 | Entity A | 3101 | $5,000.00 |
| J | 04/17/2013 | Lobbying Firm A | 2316 | $3,000.00 |
| K | 09/30/2013 | Alternative Opportunities, Inc. | 2595 | $60,000.00 |
| L | 12/05/2013 | Alternative Opportunities, Inc. | 2595 | $120,000.00 |
| M | 01/24/2014 | Dayspring Behavioral Health Svc | 8747 | $1,786.42 |
| N | 07/01/2014 | Alternative Opportunities, Inc. | 2595 | $30,000.00 |
| O | 07/25/2014 | Lobbying Firm A | 2316 | $2,350.00 |
| P | 08/22/2014 | Dayspring Behavioral Health Svc | 8747 | $1,000.00 |
| Q | 12/01/2014 | Alternative Opportunities, Inc. | 2595 | $120,000.00 |
| R | 02/03/2015 | Lobbying Firm A | 2316 | $2,500.00 |
| S | 03/06/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| T | 03/17/2015 | Lobbying Firm A | 2316 | $10,000.00 |
| U | 03/30/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| V | 04/03/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| W | 04/06/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| X | 04/09/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| Y | 04/21/2015 | Lobbying Firm A | 2316 | $8,500.00 |
| Z | 04/22/2015 | Lobbying Firm A | 2316 | $6,500.00 |
| AA | 06/28/2015 | Lobbying Firm A | 2316 | $2,500.00 |
| BB | 07/17/2015 | Preferred Family Healthcare, Inc. | 3560 | $1,349.96 |
| CC | 08/18/2015 | Lobbying Firm A | 2316 | $2,500.00 |
| DD | 08/18/2015 | Lobbying Firm A | 2316 | $10,000.00 |
| EE | 08/23/2015 | Lobbying Firm A | 2316 | $12,500.00 |
| FF | 08/23/2015 | Lobbying Firm A | 2316 | $2,500.00 |
| GG | 09/17/2015 | Preferred Family Healthcare, Inc. | 3609 | $991.80 |
| HH | 10/09/2015 | Preferred Family Healthcare, Inc. | 3587 | $1,200.00 |
| II | 10/29/2015 | Lobbying Firm A | 2316 | $15,000.00 |
| JJ | 11/17/2015 | Lobbying Firm A | 2316 | $5,000.00 |
| KK | 12/16/2015 | Preferred Family Healthcare, Inc. | 3587 | $150,000.00 |

|  | Date | Name on Source Account | Account no. (last 4) | Amount |
|---|---|---|---|---|
| LL | 04/20/2016 | Preferred Family Healthcare, Inc. | 3587 | $5,000.00 |
| MM | 06/01/2016 | Preferred Family Healthcare, Inc. | 3587 | $1,315.72 |
| NN | 08/03/2016 | Lobbying Firm A | 2316 | $10,000.00 |
| OO | 12/14/2016 | Preferred Family Healthcare, Inc. | 3587 | $140,000.00 |
|  |  |  | **Total:** | **$973,807.28** |

81)     On September 30, 2013, December 5, 2013, July 1, 2014, December 1, 2014, December 16, 2015, April 20, 2016, and December 14, 2016, Persons #1, #2 and #3 caused the checks to Jones listed in the paragraph above to be falsely classified as a consulting expense in the books and records of the Charity, when in truth and in fact the checks were payments for Jones's advocacy services, including direct contact with elected and appointed public officials.

82)     On each of the dates set forth below, Jones sent payments in the amounts set forth below to the Persons and entities set forth below:

|  | Deposit Date | Check/Wire Date | Payee | Amount |
|---|---|---|---|---|
| A | 01/12/2012 | 01/02/2012 | Lobbying Firm A | $36,000.00 |
| B | 01/20/2012 | 01/20/2012 | Lobbying Firm A | $2,000.00 |
| C | 11/02/2012 | 10/26/2012 | Person #4 | $1,000.00 |
| D | 01/04/2013 | 01/01/2013 | Person #4 | $27,000.00 |
| E | 01/08/2013 | None | Person #7 | $25,000.00 |
| F | 10/04/2013 | 10/01/2013 | Person #4 | $20,000.00 |
| G | 10/04/2013 | 10/01/2013 | Lobbying Firm A | $20,000.00 |
| H | 12/31/2013 | 12/26/2013 | Person #7 | $20,000.00 |
| I | 01/03/2014 | 12/20/2013 | Person #4 | $25,000.00 |
| J | 07/24/2014 | 07/05/2014 | Lobbying Firm B | $15,000.00 |
| K | 01/07/2015 | 01/05/2015 | Person #4 | $7,000.00 |
| L | 01/21/2015 | 01/20/2015 | Person #4 | $6,000.00 |
| M | 01/26/2016 | 12/23/2015 | Person #4 | $30,000.00 |
| N | 01/17/2017 | 01/17/2017 | Person #4 | $30,000.00 |
|  |  |  | **Total:** | **$264,000.00** |

### B. Defendant's Admission of the Forfeiture Allegation

83)     The defendant admits and acknowledges that he received a total of $973,807.28 from Alternative Opportunities, Inc. and Preferred Family Healthcare, Inc., both directly and indirectly.

84)     The defendant admits and acknowledges he willfully blinded himself to (in other words, deliberately avoided learning or recognizing) the following facts, which should have been obvious to him:  (a) Person #1, Person #2, Person #3 and Person #4 made some payments to him indirectly in order to conceal on the Charity's books and records the full amount he was paid; (b) Person #1, Person #2, and Person #3 caused the Charity to pay him as a "consultant" in order to conceal the nature of his services for the Charity, which were advocacy and lobbying; and (c) that his compensation for work done on behalf of Entity E, which was Person #1's and Person #2's for-profit company, should have been paid by Entity E, and not the Charity.

85)     The defendant further admits and acknowledges that he kicked back to Person #4 $219,000 of the amount he received by way of this scheme, and at Person #4's direction paid over an additional $45,000 of that amount to Person #7.

86)     In admitting the Forfeiture Allegation of the Information, the defendant acknowledges he understands a money judgment will be entered against him in an as-yet unspecified amount, based on the facts set forth above.

4.     **Use of Factual Admissions and Relevant Conduct.**  The defendant acknowledges, understands and agrees that the admissions contained in paragraph 3 and other portions of this plea agreement will be used for the purpose of determining his guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of the defendant's offense level in accordance with U.S.S.G. § 1B1.3(a)(2).   The defendant acknowledges, understands and agrees that the conduct charged in any dismissed counts of the indictment, as well as all other uncharged, related criminal activity, may be considered as "relevant conduct" pursuant to U.S.S.G. § 1B1.3(a)(2) in calculating the offense level for the charges to which he is pleading guilty.

5.    **Statutory Penalties.**  The defendant further understands that, upon his plea of guilty to Count 1 of the information, charging him with a violation of 18 U.S.C. § 371, that is, Conspiracy, the maximum penalty the Court may impose is not more than 5 years' imprisonment, not more than three years' supervised release, a $250,000 fine, an order of restitution, an order of forfeiture, and a $100 mandatory special assessment per felony count of conviction, which must be paid in full at the time of sentencing.  The defendant further understands that this offense is a Class D felony.

6.    **Sentencing Procedures.**  The defendant acknowledges, understands and agrees to the following:

a.    in determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United States Sentencing Commission; these Guidelines, however, are advisory in nature, and the Court may impose a sentence either less than or greater than the defendant's applicable Guidelines range, unless the sentence imposed is "unreasonable";

b.    the Court will determine the defendant's applicable Sentencing Guidelines range at the time of sentencing;

c.    in addition to a sentence of imprisonment, the Court may impose a term of supervised release of up to three years; the Court must impose a period of supervised release if a sentence of imprisonment of more than one year is imposed;

d.    if the defendant violates a condition of his supervised release, the Court may revoke his supervised release and impose an additional period of imprisonment of up to two years without credit for time previously spent on supervised release.  In addition to a new term of imprisonment, the Court also may impose a new period of supervised release, the length of which cannot exceed three years, less the term of imprisonment imposed upon revocation of the defendant's first supervised release;

e.    the Court may impose any sentence authorized by law, including a sentence that is outside of, or departs from, the applicable Sentencing Guidelines range;

f.    any sentence of imprisonment imposed by the Court will not allow for parole;

g.      the Court is not bound by any recommendation regarding the sentence to be imposed or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Office; and

h.      the defendant may not withdraw his guilty plea solely because of the nature or length of the sentence imposed by the Court.

i.      The defendant agrees that the United States may institute civil, judicial or administrative forfeiture proceedings against all forfeitable assets in which the defendant has an interest, and that he will not contest any such forfeiture proceedings;

j.      The defendant agrees to forfeit all interests he owns or over which he exercises control, directly or indirectly, in any asset that is subject to forfeiture to the United States, either directly or as a substitute for property that was subject to forfeiture but is no longer available for the reasons set forth in 21 U.S.C. § 853(p) (which is applicable to this action pursuant to 28 U.S.C. § 2461(c). With respect to any asset which the defendant has agreed to forfeit, the defendant waives any constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this plea agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment under the Eighth Amendment to the United States Constitution. The forfeited funds will be deposited into the Asset Forfeiture Fund. Forfeiture of the defendant's property shall not be treated as satisfaction of any fine, restitution, cost of imprisonment or any other penalty the Court may impose on the defendant in addition to forfeiture. However, defendant understands that the Monetary Penalties Unit of the United States Attorney's Office for the Western District of Missouri may, in its discretion, submit a restoration request as to the forfeited funds to the Money Laundering and Asset Recovery Section (MLARS), Criminal Division, U.S. Department of Justice, and if granted, these funds would be provided by the Department of Justice to the Clerk of the Court for the payment of restitution in this case. Defendant understands that whether to approve or deny this request, in whole or in part, is entirely within the discretion of the Chief of MLARS.

k.      The defendant agrees to fully and truthfully disclose the existence, nature and location of all assets forfeitable to the United States, either directly or as a substitute asset, in which he, his co-defendants and his co-conspirators have or had any direct or indirect financial interest, or exercise or exercised control, directly or indirectly, during the period from **April 9, 2011** to the present. The defendant also agrees to fully and completely assist the United States in the recovery and forfeiture of all such forfeitable assets;

l.     The defendant specifically agrees and authorizes any state or local law enforcement agency having possession of property subject to federal forfeiture to release the property to a federal agency, either prior to or after entry of an order forfeiting the defendant's interest in such property.  Further, the defendant agrees to hold harmless any state or local law enforcement agency which releases such property to any federal agency for federal forfeiture proceedings;

m.     The defendant agrees to take all necessary steps to comply with the forfeiture matters set forth herein before his sentencing;

n.     Within ten (10) days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit:  (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office.  The defendant understands that the United States will use the financial information when making its recommendation to the Court regarding the defendant's acceptance of responsibility; and

o.     At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of forfeitable assets and restitution.

7.     **Government's Agreements.**  Based upon evidence in its possession at this time, the United States Attorney's Office for the Western District of Missouri, as part of this plea agreement, agrees not to bring any additional charges against the defendant for any federal criminal offenses related to the crimes charged in the information for which it has venue and which arose out of the defendant's conduct described above.

The defendant understands that this plea agreement does not foreclose any prosecution for an act of murder or attempted murder, an act or attempted act of physical or sexual violence against the Person of another, or a conspiracy to commit any such acts of violence or any criminal activity of which the United States Attorney for the Western District of Missouri has no knowledge.

The defendant recognizes that the United States' agreement to forego prosecution of all of the criminal offenses with which the defendant might be charged is based solely on the promises

made by the defendant in this agreement. If the defendant breaches this plea agreement, the United States retains the right to proceed with the original charges and any other criminal violations established by the evidence. The defendant expressly waives his right to challenge the initiation of the dismissed or additional charges against him if he breaches this agreement. The defendant expressly waives his right to assert a statute of limitations defense if the dismissed or additional charges are initiated against him following a breach of this agreement. The defendant further understands and agrees that, if the Government elects to file additional charges against him following his breach of this plea agreement, he will not be allowed to withdraw his guilty plea.

8. **Preparation of Presentence Report.** The defendant understands the United States will provide to the Court and the United States Probation Office a government version of the offense conduct. This may include information concerning the background, character and conduct of the defendant, including the entirety of his criminal activities. The defendant understands these disclosures are not limited to the counts to which he has pleaded guilty. The United States may respond to comments made or positions taken by the defendant or the defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The United States and the defendant expressly reserve the right to speak to the Court at the time of sentencing pursuant to Rule 32(i)(4) of the Federal Rules of Criminal Procedure.

9. **Withdrawal of Plea.** Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of the defendant's plea of guilty and its formal acceptance by the Court. In the event of such withdrawal, the parties will be restored to

their pre-plea agreement positions to the fullest extent possible. However, after the plea has been formally accepted by the Court, the defendant may withdraw his pleas of guilty only if the Court rejects the plea agreement, or if the defendant can show a fair and just reason for requesting the withdrawal. The defendant understands that, if the Court accepts his pleas of guilty and this plea agreement but subsequently imposes a sentence that is outside the defendant's applicable Sentencing Guidelines range, or imposes a sentence that the defendant does not expect, like or agree with, he will not be permitted to withdraw his pleas of guilty.

10. **Agreed Guidelines Applications.** With respect to the application of the Sentencing Guidelines to this case, the parties stipulate and agree as follows:

      a.     The Sentencing Guidelines do not bind the Court and are advisory in nature. The Court may impose a sentence that is either above or below the defendant's applicable Guidelines range, provided the sentence imposed is not "unreasonable."

      b.     The applicable Guidelines Manual is the one that took effect on November 1, 2016.

      c.     The applicable Guidelines section for Count 1 is U.S.S.G. § 2B1.1, which provides for a **base offense level of 6**;

      d.     While the facts are as agreed in paragraph 3, there is no stipulation between the parties regarding the legal issue of what portion of the loss amount is attributable to the defendant, and the parties remain free to advocate their respective positions. The defendant understands that the Government's position on this issue is that pursuant to U.S.S.G. § 2B1.1(b)(1)(H), a 14-level enhancement applies, based on a loss amount greater than $550,000 but less than $1,500,000; and

      e.     The defendant has admitted his guilt and clearly accepted responsibility for his actions, and has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Government and the Court to allocate their resources efficiently. Therefore, he is entitled to **a three-level reduction** pursuant to § 3E1.1(b) of the Sentencing Guidelines. The Government, at the time of sentencing, will file a written motion with the Court to that effect, unless the

defendant (1) fails to abide by all of the terms and conditions of this plea agreement, any supplement thereto, and his pretrial release; or (2) attempts to withdraw his guilty plea, violates the law, or otherwise engages in conduct inconsistent with his acceptance of responsibility.

f.      The defendant appears to have a **criminal history category of I**.  The parties agree that the Court will determine his applicable criminal history category after receipt of the presentence investigation report prepared by the United States Probation Office.

g.      The defendant understands that the estimate of the parties with respect to the Guidelines computation set forth in the subsections of this paragraph does <u>not</u> bind the Court or the United States Probation Office with respect to the appropriate Guidelines levels.  Additionally, the failure of the Court to accept these stipulations will not, as outlined in paragraph 9 of this plea agreement, provide the defendant with a basis to withdraw his plea of guilty.

h.      The United States agrees not to seek an upward departure from the Guidelines or a sentence outside the Guidelines range.  **The defendant remains free to argue for any sentence authorized by law, including a downward departure from the Guidelines or a variance from the Guidelines range.**  The agreement by the Government to not seek a departure from the Guidelines is not binding upon the Court or the United States Probation Office and the Court may impose any sentence authorized by law, including any sentence outside the applicable Guidelines range that is not "unreasonable."

i.      The defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of the defendant's sentence, including the determination of any mandatory minimum sentence (including the facts that support any specific offense characteristic or other enhancement or adjustment), and any legally authorized increase above the normal statutory maximum.  The defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed, and waives any right to have those facts alleged in the indictment.  The defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay.

j.      The defendant understands and agrees that the factual admissions contained in paragraph 3 of this plea agreement, and any admissions that he will make during his plea colloquy, support the imposition of the agreed upon Guidelines calculations contained in this agreement.

11.     **Effect of Non-Agreement on Guidelines Applications.**  The parties understand, acknowledge and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed in paragraph 10 and its subsections. As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.

12.     **Change in Guidelines Prior to Sentencing.**  The defendant agrees that, if any applicable provision of the Guidelines changes after the execution of this plea agreement, then any request by the defendant to be sentenced pursuant to the new Guidelines will make this plea agreement voidable by the United States at its option.  If the Government exercises its option to void the plea agreement, the United States may charge, reinstate, or otherwise pursue any and all criminal charges that could have been brought but for this plea agreement.

13.     **Government's Reservation of Rights.**  The defendant understands that the United States expressly reserves the right in this case to:

     a.     oppose or take issue with any position advanced by the defendant at the sentencing hearing which might be inconsistent with the provisions of this plea agreement;

     b.     comment on the evidence supporting the charges in the information;

     c.     oppose any arguments and requests for relief the defendant might advance on an appeal from the sentences imposed, and that the United States remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court chooses not to follow any recommendation made by the United States; and

     d.     oppose any post-conviction motions for reduction of sentence, or other relief.

14.    **Defendant's Cooperation**.

a.    The defendant agrees to cooperate fully and truthfully with the United States before and after he is sentenced, including but not limited to the following:

> i.    The defendant agrees to provide all information concerning his knowledge of, and participation in, the offenses charged in the information, and any other crimes about which he has knowledge;
>
> ii.    The defendant agrees that he will not falsely implicate any Person or Entity and will not protect any Person or Entity through omission or false or misleading information and that all information provided will be truthful, complete and accurate;
>
> iii.    The defendant agrees to testify as a witness before any grand jury, hearing, or trial when requested to do so by the United States;
>
> iv.    The defendant agrees to hold himself reasonably available for any interviews the United States may require. The defendant waives any right to the presence of counsel at such meetings, debriefings, or pretrial preparation sessions. The parties agree that no prior consultation with defense counsel shall be necessary to conduct these meetings, debriefings or interviews, unless his attorney specifically requests such notice;
>
> v.    The defendant agrees to provide the United States with all documents or other items under his control that may pertain to any criminal violations;
>
> vi.    The defendant understands that his cooperation shall be provided to any local, state, and federal law enforcement agency deemed appropriate by the United States and that he may be called upon as a witness by any authority that has been provided his cooperation. The defendant further understands that it will be necessary for the United States to disclose this cooperation agreement to opposing counsel if he is called or scheduled to testify as a witness for the prosecution in any future court hearing or trial in accordance with this cooperation agreement.
>
> vii.    The defendant agrees and understands that this cooperation agreement requires that his cooperation continues even after the

time he is sentenced. Failure to continue to cooperate after a sentence is imposed constitutes a basis to void this agreement by the United States and will allow the Government to re-institute charges that were previously dismissed pursuant to this agreement;

viii. The defendant agrees that if the United States determines that he has not provided full and truthful cooperation, or has committed any local, state, or federal crime between the date of this agreement and his sentencing, or has otherwise violated any other provision of the entire plea agreement, the entire plea agreement may be voided by the United States and the defendant shall be subject to prosecution for any federal crime of which the United States has knowledge including, but not limited to, perjury, obstruction of justice, and any substantive offenses arising from this investigation. Such prosecution may be based upon any information provided by the defendant during the course of his cooperation, or upon leads derived therefrom, and this information may be used as evidence against him. In addition, the defendant's previously entered plea of guilty will remain in effect and cannot be withdrawn. Further, any prosecution which is not barred by the applicable statute of limitations on the date of the signing of the agreements may be commenced against the defendant in accordance with the agreements, notwithstanding the expiration of the statute of limitations between the time of signing the agreements and the commencement of the prosecution. In the event the publicly filed plea agreement and this addendum are signed on different days, the date of the earliest agreement shall be used as the starting point for the waiver of the statute of limitations. It is the specific intent of this plea agreement to waive any and all defenses based upon the statute of limitations with respect to any prosecution which is not barred by the statute of limitations on the date the agreements are signed by the defendant;

ix. The defendant understands and agrees that if he commits a local, state or federal crime (whether a felony or misdemeanor) or violates any conditions of his bond while he is cooperating with the United States, a motion for downward departure will not be filed by the Government on behalf of defendant.

b. "Substantial assistance" within the meaning of 18 U.S.C. § 3553(e) has not yet been provided by the defendant. Upon the determination by the United States that the defendant has provided "substantial assistance," the United States,

pursuant to 28 U.S.C. § 994(n) and 18 U.S.C. § 3553(e), will request the Court to reduce the sentence the defendant would otherwise receive under the applicable statutes, or will request a sentence reduction pursuant to § 5K1.1 of the Sentencing Guidelines, or reductions under both the applicable statutes and the Guidelines. The United States reserves the right to make the sole determination as to whether and when the defendant has provided such substantial assistance and further whether to request a reduction generally or a specific sentence or sentence reduction.

c.      In exchange for the defendant's agreement to cooperate, the United States agrees not to use new information that the defendant might provide about his own criminal conduct except as specifically authorized by § 1B1.8 of the United States Sentencing Guidelines. As such, this information may be revealed to the Court but may not be used against the defendant in determining the defendant's applicable Guidelines range or departing above his Guidelines range. The defendant understands and agrees, however, that under U.S.S.G. § 1B1.8, there shall be no such restrictions on the use of the information: (1) previously known to the United States; (2) revealed to the United States by, or discoverable through, an independent source; (3) in a prosecution for perjury or giving a false statement; (4) in the event there is a breach of this agreement; or (5) in determining whether and to what extent a downward departure as a result of a government motion pursuant to 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1 is warranted.

d.      Moreover, in exchange for the defendant's agreement to cooperate, following the completion of the defendant's presentence investigation report and prior to any sentencing hearing in the Western District of Missouri, the United States Attorney for the Western District of Missouri agrees that he will approve the defendant's request, pursuant to Rule 20 of the Federal Rules of Criminal Procedure, to transfer this case to the Eastern District of Pennsylvania for sentencing, and will not object to the defendant's request that his sentences for this case and Eastern District of Pennsylvania Case No. 2:17-cr-00563-JD be run concurrently;

e.      In the event that the defendant's case is transferred to the Eastern District of Pennsylvania, the defendant understands and agrees that his obligations under the terms of this agreement continue, and any breach of any provision of this agreement could result in the transfer of this case back to the Western District of Missouri, if a sentence has not yet been entered, or in new or additional charges being brought in the Western District of Missouri.

f.      If the defendant commits any crimes, violates any conditions of release, or violates any term of this agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is

intentionally misleading, incomplete, or untruthful, or otherwise breaches this plea agreement, the United States will be released from its obligations under this agreement. The defendant, however, will remain bound by the terms of the agreement, and the terms of the plea agreement, and will not be allowed to withdraw his plea of guilty.

g. The defendant also understands and agrees that in the event he violates any terms of the plea agreement, all statements made by him to law enforcement agents subsequent to the execution of this agreement, any testimony given by him before a grand jury or any tribunal or any leads from such statements or testimony shall be admissible against him in any and all criminal proceedings. The defendant waives any rights that he might assert under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by his subsequent to this agreement.

15. **<u>Waiver of Constitutional Rights.</u>** The defendant, by pleading guilty, acknowledges that he has been advised of, understands, and knowingly and voluntarily waives the following rights:

a. the right to plead not guilty and to persist in a plea of not guilty;

b. the right to be presumed innocent until his guilt has been established beyond a reasonable doubt at trial;

c. the right to a jury trial, and at that trial, the right to the effective assistance of counsel;

d. the right to confront and cross-examine the witnesses who testify against him;

e. the right to compel or subpoena witnesses to appear on his behalf; and

f. the right to remain silent at trial, in which case his silence may not be used against him.

The defendant understands that, by pleading guilty, he waives or gives up those rights and that there will be no trial. The defendant further understands that, if he pleads guilty, the Court may ask him questions about the offenses to which he pleaded guilty, and if the defendant answers those

questions under oath and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making a false statement. The defendant also understands that he has pleaded guilty to felony offenses and, as a result, will lose his right to possess a firearm or ammunition and might be deprived of other rights, such as the right to vote or register to vote, hold public office, or serve on a jury.

16. **Waiver of Appellate and Post-Conviction Rights.**

    a.    The defendant acknowledges, understands and agrees that, by pleading guilty pursuant to this plea agreement, he waives his right to appeal or collaterally attack a finding of guilt following the acceptance of this plea agreement, except on grounds of (1) ineffective assistance of counsel; or (2) prosecutorial misconduct; and

    b.    The defendant expressly waives his right to appeal his sentence, directly or collaterally, on any ground except claims of: (1) ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) a sentence imposed in excess of the statutory maximum. However, if the United States exercises its right to appeal the sentence imposed as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may, as part of the Government's appeal, cross-appeal his sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this agreement.

17. **Financial Obligations.** By entering into this plea agreement, the defendant represents that he understands and agrees to the following financial obligations:

    a.    The Court must order restitution to the victims of the offense to which the defendant is pleading guilty. The defendant agrees that the Court may order restitution in connection with all other uncharged, related criminal activity. The offense conduct involves theft from an organization receiving Federal funds. Because Alternative Opportunities, Inc., and Preferred Family Healthcare, Inc., were nonprofit organizations that received funding almost exclusively from Federal and state entities, and at the time the defendant committed the offense charged in the information AO and PFH, by and through its executives named in the information, engaged in substantial activities that were illegal and contrary to public policy, the parties agree to recommend the Court order restitution to the United States and the states that funded the Charity, in the total amount stolen as a result of the offense charged in the Information, with the payments apportioned corresponding to the United States' and states' percentage shares of contribution to

AO's and PFH's gross income, to be determined in connection with the Presentence Investigation;

b.      The United States may use the Federal Debt Collection Procedures Act and any other remedies provided by law to enforce any restitution order that may be entered as part of the sentence in this case and to collect any fine;

c.      The defendant will fully and truthfully disclose all assets and property in which he has any interest, or over which the defendant exercises control, directly or indirectly, including assets and property held by a spouse, nominee or other third party. The defendant's disclosure obligations are ongoing, and are in force from the execution of this agreement until the defendant has satisfied the restitution order in full;

d.      Within ten (10) days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit: (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office. The defendant understands that compliance with these requests will be taken into account when the United States makes a recommendation to the Court regarding the defendant's acceptance of responsibility;

e.      At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of substitute assets and restitution;

f.      The defendant hereby authorizes the USAO to obtain a credit report pertaining to him to assist the USAO in evaluating the defendant's ability to satisfy any financial obligations imposed as part of the sentence;

g.      The defendant understands that a Special Assessment will be imposed as part of the sentence in this case. The defendant promises to pay the Special Assessment of **$100** by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case. The defendant agrees to provide the Clerk's receipt as evidence of his fulfillment of this obligation at the time of sentencing;

h.      The defendant certifies that he has made no transfer of assets or property for the purpose of: (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; or (3) hindering efforts of the USAO to enforce such financial obligations. Moreover, the defendant promises that he will make no such transfers in the future; and

i. In the event the United States learns of any misrepresentation in the financial disclosure statement, or of any asset in which the defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of the defendant by ten thousand dollars ($10,000.00) or more, the United States may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, collect the full forfeiture, restitution and fines imposed by any criminal or civil judgment, and also collect 100% (one hundred percent) of the value of any previously undisclosed assets. The defendant agrees not to contest any collection of such assets. In the event the United States opts to be relieved of its obligations under this plea agreement, the defendant's previously entered pleas of guilty shall remain in effect and cannot be withdrawn.

18. **Waiver of FOIA Request.** The defendant waives all of his rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

19. **Waiver of Claim for Attorney's Fees.** The defendant waives all of his claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

20. **Defendant's Breach of Plea Agreement.** If the defendant commits any crimes, violates any conditions of release, or violates any term of this plea agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is intentionally misleading, incomplete or untruthful, or otherwise breaches this plea agreement, the United States will be released from its obligations under this agreement. The defendant, however, will remain bound by the terms of the agreement, and will not be allowed to withdraw his pleas of guilty.

The defendant also understands and agrees that, in the event he violates this plea agreement, all statements made by him to law enforcement agents subsequent to the execution of this plea agreement, any testimony given by him before a grand jury or any tribunal, or any leads from such statements or testimony, shall be admissible against him in any and all criminal proceedings. The defendant waives any rights that he might assert under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by him subsequent to this plea agreement.

21.     **<u>Defendant's Representations.</u>**     The defendant acknowledges that he has entered into this plea agreement freely and voluntarily after receiving the effective assistance, advice and approval of counsel. The defendant acknowledges that he is satisfied with the assistance of counsel, and that counsel has fully advised him of his rights and obligations in connection with this plea agreement. The defendant further acknowledges that no threats or promises, other than the promises contained in this plea agreement, have been made by the United States, the Court, his attorneys, or any other party to induce him to enter his pleas of guilty.

22.     **<u>No Undisclosed Terms.</u>**     The United States and the defendant acknowledge and agree that the above stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement between the parties, and that any other terms and conditions not expressly set forth in this agreement or any written supplemental agreement do not constitute any part of the parties' agreement and will not be enforceable against either party.

23.    **Standard of Interpretation.**   The parties agree that, unless the constitutional implications inherent in plea agreements require otherwise, this plea agreement should be interpreted according to general contract principles and the words employed are to be given their normal and ordinary meanings.   The parties further agree that, in interpreting this agreement, any drafting errors or ambiguities are not to be automatically construed against either party, whether or not that party was involved in drafting or modifying this agreement.

THOMAS M. LARSON
Acting United States Attorney

Dated:  _12/18/2017_                    By

_/s/ Steven M. Mohlhenrich_
STEVEN M. MOHLHENRICH
Assistant United States Attorney


ANNALOU TIROL
Acting Chief, Public Integrity Section

Dated:  _12/18/2017_                    By

_/s/ Steven M. Mohlhenrich for_
SEAN F. MULRYNE
Trial Attorney, Public Integrity Section
United States Department of Justice

I have consulted with my attorney and fully understand all of my rights with respect to the offense charged in the information. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines. I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand this plea agreement and I voluntarily agree to it.


Dated:    *12/18/2017*            */s/ Donald Andrew Jones*

                                                  DONALD ANDREW JONES

                                                  Defendant


I am defendant Donald Andrew Jones's attorney. I have fully explained to him his rights with respect to the offense charged in the information. Further, I have reviewed with him the provisions of the Sentencing Guidelines that might apply in this case. I have carefully reviewed every part of this plea agreement with him. To my knowledge, Donald Andrew Jones's decision to enter into this plea agreement is an informed and voluntary one.


Dated:    *12/18/2017*            */s/ Alan J. Tauber*

                                                  ALAN J. TAUBER

                                                  Attorney for Defendant